Good morning, Your Honor. May it please the Court, Edward Bialak for Petitioner Kavousi. Your Honors, when I first reviewed the facts in this case, the record, I was struck by a couple of things. Number one, of course, there were a lot of issues we've identified in our briefs. It's almost as if the fact pattern were devised by a bar examiner to test issue-spotting capabilities of budding young lawyers. It may be within the ken of budding young lawyers to spot all the issues, but it certainly was not and is not within the ability of an immigrant who's appearing in pro per. Which leads to the second thing that struck me, which is that this case seemed to have Murphy's Law in effect. That if something could go wrong, it invariably seemed to go wrong. I'm referring to the withdrawal of counsel rather precipitously. A letter sent by counsel stating that he intends to withdraw and that he will notify the petitioner of the result. It has the added benefit, that letter, of telling him to show up on the wrong day. But he never does give the petitioner a notice that he's filed his motion to withdraw, which in itself raises some due process considerations. Okay, but he did go to court and did evidence some familiarity with the fact that his lawyer was going to withdraw. That's correct, Your Honor. But the question becomes, where did that familiarity come? Now, it could have come from the letter that he intended to withdraw. It could have come from a phone conversation he had with the lawyer. And, of course, we then have the anomaly of the notice of ruling in August, a couple of weeks before the continued hearing, where the IJ doesn't even indicate whether he's granted or denied the motion. Okay, let's fast forward a little bit. He shows up and he knows his lawyer's not going to be his lawyer anymore and he wants... He wants time. He wants time. Right. Suppose we were to agree with you that the judge should have given the continuance. Well, then I think the matter has to be remanded. If for all issues he gets a just restart from scratch, is that right? Well, I think there's no question that's all that can be done. First of all, these issues, as the Court is aware, are nuanced and technical and highly sophisticated issues. They're substantial issues, issues of asylum and whether the timeliness and versus whether there's changed conditions or exceptional circumstances. Firm resettlement is another highly complex issue, which we believe is, you know, we believe that the Court, the IJ, made substantial errors in virtually all of these issues that he had to address, either applying the wrong legal standard or not even addressing the issues. Either one of those omissions, I would submit, would be sufficient for this Court to remand to have the IJ get it right. But all of these issues almost take a second seat to the fact that this man was not entitled, was not enabled to have counsel to present his case. Now, when he showed up in September at the continued hearing, it would have been highly appropriate to inquire, what did he know and when did he know it? After all, the IJ took the position that he had a lot of time to get another lawyer. The IJ says, well, you're here today by yourself, sir. Are you ready to proceed with your case and represent yourself? And the answer is, if you grant me some time, I'll try to find another lawyer. But that, the IJ continues, well, sir, I cannot continue your case because you didn't do what you were required to do. We can't wait forever for you to get somebody to represent you. And finally, concluding his statements on the issue, apparently ignoring the fact that he only ruled on the motion to withdraw about three weeks earlier and apparently unaware that his notice of ruling doesn't indicate what his ruling was, he tells the Petitioner, well, sir, you found out that he withdrew back in July and we're now in September, so you have had over a month and a half to get someone to represent you. At any rate, we're going to start this case. Your Honors, I would submit that is not even within shouting distance of the test that has been well established in this Court for determining whether an alien knowingly and intelligently is going to waive his or her right to counsel and or whether there are circumstances in the record that reflect that the alien is simply not in a position to retain counsel or is just seeking to buy time and delay things. Clearly, this is not the case here. The one continuance the Petitioner asked for to get counsel, he was as good as his word, and he showed up with counsel at the next hearing. We could discuss all the subsidiary issues, but as I believe it's unnecessary to reach. Counsel seems to say that the reason he's requesting to leave this client is because the client won't cooperate. Well, that's what the lawyer says in his motion, the motion that the client never apparently saw until he showed up in court in September. We don't know. And the record. We don't know whether he saw it or not. We don't. But we do know that in response to the IJ's questioning on those points, the Petitioner denies it. He says that's not true. I did cooperate. It was a question of getting the documents I needed. So, but even if the lawyer had cause to withdraw for whatever reason, the bottom line is the Petitioner still left lawyerless and rudderless in the middle of this very complex ocean of laws and facts that he has to somehow weave the tapestry together. So in our view, we don't even have to reach the other issues that we've identified in our brief. The due process question, the denial of rights counsel is so egregious in this case that a remand is not only appropriate but necessary. And I will reserve the remainder of my time to reply. Thank you, Mr. Feiler. Thank you, Your Honor. Good morning. Good morning. May it please the Court, my name is Jesse Bless. I represent the Attorney General of the United States. The Petitioner in this case was aware of the circumstances and the procedure run by this immigration judge. He had shown up pro se when he had first begun proceedings without an attorney. The immigration judge notified him, listen, I'm going to afford you some time. Please go out and use that time wisely and obtain an attorney. This will be the one time I can afford you on my docket to do so. He did so, and he set a merits hearing on an asylum claim from April to September of that year, a substantial period of time. In the middle of that procedure, he was informed by the counsel that he had retained by his attorney that his attorney no longer wanted to represent him. He was not incarcerated. He's a highly educated individual. He did not file any notice with the immigration judge that he was trying, attempting to secure counsel. Well, as a matter of fact, I mean, the judge got the motion by the attorney and then sent out an order that you can't tell whether it's granted or denied. What, the withdrawal? Yeah, I'm talking about number 214 where it says the motion is granted slash denied. I mean, you can't tell whether it's granted. He didn't cross out one or the other. Well, certainly during the questioning in the record, at page 73 and 74 of the record, the Petitioner makes clear that he understood that his attorney was not representing him anymore. Well, he understood that his attorney wanted out. Right. He didn't necessarily understand that the judge had allowed it because the order is ambiguous on its face. But if the I.J.'s order wasn't necessarily clear, he certainly didn't say, well, I didn't know. I thought he was going to come today. I thought he still represented me. No, that wasn't the case. The case was you were notified that your attorney withdrew, and he says, yeah, I knew that. I knew that. It wasn't a question of, wait, I thought he was showing up today. I thought, wait a minute, I'm going at this alone? That was never raised to the immigration judge. Well, he said, if you give me more time, I'll get another lawyer. Right. But the question in this case is whether the immigration judge is required or has within his discretion the ability to control his docket, especially when you have a person who is not entitled to counsel. He has a right to go out and try and seek counsel. He's been aware of the proceedings in the immigration court. He's been afforded time before. He's had a period at least since July where he's been aware of the circumstances of his case and hasn't taken any steps to request time before proceeding on the day of his merits hearing. He certainly could have, you know, written. That's how it's normally done in every court in this country. Excuse me, I need more time. I've tried. I know I have a scheduled hearing on a date in question, but I need a little more time. Certainly nothing was done before then. And so when he shows up at the day of his merits hearing, which has been scheduled for six months, and requests more time, surely it's not an abuse of discretion for the immigration judge to say, you know, we're going to handle the schedule for today, if you ever request it. He wasn't incarcerated. I mean, the question is, he wasn't incarcerated, and he's a very highly educated individual. His proceedings had taken place at that point for, you know, over a year or approximately a year. This isn't, you know, there wasn't a surprise. It was a surprise for the immigration judge. I mean, to have him request the day of the merits hearing. And so as a matter of controlling his docket, certainly the immigration judge acted within his discretion to proceed to the merits hearing, which was scheduled for the day in question. You know, I find our cases somewhat in conflict. Some of them say you only get one continuance, and the others say you've got to have a waiver if you're of the attorney privilege. And so how do we resolve that? There are certainly cases, and specifically I have to speak to the Tawadros matter, where it's almost as if this Court suggests that there has to be a knowingly and involuntarily waiver of counsel. Again, I speak to the there is no statutory right or constitutional right to counsel at the government's expense in immigration proceedings. These are civil proceedings. So to the extent that that's a holding ---- We say that these people have a right to counsel at their own expense. At their own expense. They can go out and get them. Right. If they have a right to counsel. This fellow says, gee, I don't have counsel now, but I'd like to get one. Where are we left with that? Let's say that the next time he showed up, he said, well, you know what? I still didn't succeed in doing it. But I'm not knowingly and voluntarily waiving my right. Well, I think after a while, you are able to say that he really can't get counsel. Right. But who is in the best position to make that line drawing? Well ---- The person who is controlling his docket in the eyes of the government. Right. But I think he has to give him a little more leeway than one continuance, as I see the cases. Right. But in the circumstances of this case where this wasn't his first continuance, he was aware and forewarned when these proceedings began that you can go out and seek and have some time to receive counsel. And he did so. And he said, this is the only time I'm going to allow that to happen. And now, so the fact that his attorney and his client and the attorney and the petitioner did not get along, and now, does that ---- that starts the new ---- a new set of proceedings? Well, I think your argument would have a lot more force if the immigration judge's order clearly told him that I'm going to allow the lawyer to withdraw. You're on your own, or you better get another lawyer instead. It's not at all clear what the immigration judge did with this motion on the day this guy shows up. But I do believe it is clear that he understood. But it's not a matter of ---- this argument that is raised was not raised by the petitioner. This is a fact that is submitted by the Court. And the fact that the petitioner never said, well, your order that I got, I don't know. I thought he was coming today. That was never, never raised below. Let me ask you about the merits. I'm a little troubled by how the I.J. dealt with the merits, too. The I.J. ---- the guy testifies that he is now a Christian. There is evidence in the record that Muslims who convert to Christianity are punished by death when they ---- in Iran. That comes from the Country Conditions Report. The I.J. makes no reference to the Country Conditions Report containing this and says instead, well, you know, he can practice Christianity in secret, doesn't have to ---- you know, he can do it and hide his religion when he goes back. What kind of an answer is that? Well, I think the Country Reports, to speak to the first point, I think the Country Reports are somewhat speaking to the different way. Christians are respected. They respect Christians. It doesn't say ---- And the apostasy is when you renounce, you know, Islam. There's no ---- Yeah, that's what this guy did. He started as a Muslim, and now he's a Christian. That's apostasy. The record ---- And apostasy is punished by death in Iran. Well, the record certainly doesn't say that he began as a Muslim. And there's certainly evidence in the record that suggests prior to him coming to the And in fact, that was the reasons he provided for not showing up at these prayer meetings when he was a professor in Iran. And it certainly wasn't common then. What do you make of the IJ's reasoning, well, he can go back and practice Christianity in secret? I don't believe in secret. I think the immigration judge was referring to the Petitioner's testimony that he, in fact, didn't go out and speak. He wasn't a priest. He didn't become a priest or a reverend. He was ---- he said, I practice in my own private way. You know, the immigration judge is, you know ---- He almost didn't go to church. Right. He never went to church. And he said ---- He went once or twice. This whole issue of conversion, it was unclear whether he, in fact, converted. He was not baptized. Prior to leaving Iran, he said, he said, I studied occasionally, and I only increased it. And that's a crucial testimony. That's in 97 and 98 of the record. He says, I increased my study. So, in fact, to make this out to a conversion is not supported by the record. You know, certainly, he became maybe more pro-Western. He certainly continued to live outside of Iran, as he had done for many years before. And the way the immigration judge's decision reads is that he had left, he had gone to Germany, he had believed in pro-Western ideology, he had returned, he had not been harmed. There's nothing materially different on the facts of this case because he had been in the United States. Had he converted to Christianity when he had gone back to Iran? Or was that later? Excuse me? Didn't he convert to Christianity after he left Iran? Well, the record doesn't say that he converted. The record, he makes claims. He also said, I increased it. I increased my study. You know, the level of conversion, it's an amorphous standard. I mean, you know, it's not as if he converted, started a Bible school, and was going to bring that Bible school back to Iran. I don't think, you know, there was nothing certainly similar to that level of ---- He was not an evangelist. Right. He was not ---- He was a Christian. He was a Christian. And there are many Christians, as the country reports make clear, there are many Christians in Iran. You know, the ones they don't like are the ones who converted. Excuse me? The ones they don't like, the ones they put to death are the ones who converted. Well, I've studied the record, and in my review, I cannot make, I cannot say once where he initially started as a Muslim. There's not one time where he said that, you know, I was a devout follower. And certainly, his own experiences in Iran of not going to the prayer meetings and in front of everyone who was there belies his claim, because he was not harmed before. He didn't like it. And by the way he was treated, he went off and became a farmer. Right. He certainly didn't like it, but he certainly was not persecuted or tortured, which was the issue before the Court today. Thank you very much, Mr. Bless. Is there a ---- Malik? Yes. Malik. Very briefly, the issue that the Court was struggling with and counsel is struggling to enunciate just underscores, in my view, the extreme handicap that the petitioner was laboring under when he was lawyerless. Any competent lawyer was going to, in my view, would have significantly expounded upon his conversion from Islam. The nature of apostasy apparently in Iran is not whether you convert to Christianity or to Judaism or to Hinduism or how you show your religious fervor. The nature of apostasy there, punishable by death, is renouncing Islam. You could become an atheist and you will be considered an apostate. All of these issues should have been addressed in detail, and any competent lawyer, I'm convinced, would have done so. I would like to close because I know I only have a moment here. In our brief, we cited the case of Rios-Darius. And that was an opinion authored by Judge Chambers, after whom this courthouse is named. And speaking of the issue of right to counsel, this is what the judge said in 1985. We have serious doubts as to how knowing and intelligent the waiver of voluntary departure was. Moreover, we are convinced that his asylum case will be more advantageously presented by retained counsel. We are not in favor of an agency treating the statutes and regulations by which it is governed as casually as it viewed them here. We will continue to take a close look at a claim such as that raised by petitioner, especially where so fundamental a question as right to counsel of one's choice is concerned. I would submit, Your Honors, his comments are apropos to this case. This case does not pass the smell test, respectively, appropriate for a remand. Thank you, Mr. Biley. Thank you, Your Honors. Mr. Bless, thank you also. The case argued is submitted. 0475102, Matusoff v. MacCasey is submitted on the briefs.
judges: Hall, T.G. Nelson, Silverman